OPINION *Page 2 
{¶ 1} Appellant Tabitha Anderson appeals from the July 6, 2006, entry of the Muskingum County Court of Common Pleas, Juvenile Division.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Clayton Anderson (DOB 10/31/05) is the biological child of appellant Tabitha Anderson and Matthew Rausenberg. On February 21, 2006, a complaint was filed in the Muskingum County Court of Common Pleas, Juvenile Division alleging that Clayton was a neglected and dependent child. Pursuant to a decision filed on February 22, 2006, the trial court ordered that Clayton be placed in the temporary custody of DeAnna and Ty Davis, who were relatives. The trial court, in its decision, found that Clayton was suffering from illness or injury and was not receiving proper care.
 {¶ 3} On April 24, 2006, appellee Muskingum County Children Services filed a motion for a psychological evaluation of appellant. As memorialized in an Order filed the next day, the trial court granted such motion.
 {¶ 4} An adjudicatory and dispositional hearing was held on May 11, 2006. At the hearing Dr. David Tennenbaum, the psychologist who evaluated appellant, testified that he was unable to complete an evaluation of appellant because, upon meeting her the second time, he was told that he had struck her and that "her significant other was to be with her the whole time." Transcript at 4. Dr. Tennenbaum testified that having "her significant other" present would have made the test results invalid. Dr. Tennenbaum's report did not contain any findings or diagnosis.
 {¶ 5} Dr. Tennenbaum testified that he was, however, able to meet with appellant twice. He testified that appellant told him that she had a Pentecostal *Page 3 
upbringing in a home where there was physical and other abuse. Dr. Tennenbaum further testified that appellant had delusional thoughts. The following testimony was adduced when Clayton's Guardian ad Litem asked Dr. Tennenbaum whether appellant had discussed friendly and hostile spirits with him:
 {¶ 6} "A: Doctor Tennenbaum: Yes
 {¶ 7} "Q: Attorney Weaver: Did she describe a phenomena where literally she was burned? Her hand was burned?
 {¶ 8} "A: Doctor Tennenbaum: She talked actually of Tim's [appellant's boyfriend] hand being burned on a Bible. That when she touched the [B]ible, she perceived it as being hot.
 {¶ 9} "Q: Attorney Weaver: Did she describe what is sometimes called, seeing things, or seeing something? Did she describe seeing a body hanging in the closet?
 {¶ 10} "A: Doctor Tennenbaum: Yes.
 {¶ 11} "Q: Attorney Weaver: And presumably that was, would it be, you assumed it was a dead body that she saw?
 {¶ 12} "A: Doctor Tennenbaum: She presented it that way.
 {¶ 13} "Q: Attorney Weaver: Did she then go on to say when she turned her head, she no longer saw it?
 {¶ 14} "A: Doctor Tennenbaum: That's correct.
 {¶ 15} "Q: Attorney Weaver: Did she describe seeing a, a victim of, a dead person who was a victim of having been murdered?
 {¶ 16} "A: Doctor Tennenbaum: Yes she did. *Page 4 
 {¶ 17} "Q: Attorney Weaver: Would that have been a women in like a red fancy dress?
 {¶ 18} "A: Doctor Tennenbaum: I've described that in my report, yes.
 {¶ 19} "Q: Attorney Weaver: Did she describe having closed her eyes when she saw this and then when she opened them, the dead woman was no longer there?
 {¶ 20} "A: Doctor Tennenbaum: That's correct.
 {¶ 21} "Q: Attorney Weaver: Did she describe at one point having heard in the middle of the night, a, at one point did you inquire whether she had ever heard anything? Heard voices?
 {¶ 22} "A: Doctor Tennenbaum: Yes I did.
 {¶ 23} "Q: Attorney Weaver: Did she describe having heard in, a voice saying `Help me' Help me.' `He's trying to kill my baby'? Did she, do you recall that?
 {¶ 24} "A: Doctor Tennenbaum: I do.
 {¶ 25} "Q: Attorney Weaver: Do you recall that she then said `I go outside'. `I don't see nobody there'. `Not even foot steps'?
 {¶ 26} "A: Doctor Tennenbaum: That's correct.
 {¶ 27} "Q: Attorney Weaver: And this was not, did she say this was a, when she was with her defined as ex? Is that correct?
 {¶ 28} "A: Doctor Tennenbaum: I believe that to be true, yes.
 {¶ 29} "Q: Attorney Weaver: Do you recall? Have you in your professional career ever heard or had concerns with regard to what someone might do if they believed that, in demons, to a child, a possession? Are you familiar with, I'll withdraw that question. Are you familiar with the concept of possession? *Page 5 
 {¶ 30} "A: Doctor Tennenbaum: Yes of course.
 {¶ 31} "Q: Attorney Weaver: Have you ever read of anyone professionally who believed that they could be possessed?
 {¶ 32} "A: Doctor Tennenbaum: Yes and I've interviewed many folks, typically in state hospitals that make these proclamations.
 {¶ 33} "Q: Attorney Weaver: And have you ever heard, and again this may be rare, of someone who believes a child can be possessed?
 {¶ 34} "A: Doctor Tennenbaum: Yes of course . . .
 {¶ 35} "Q: Attorney Weaver: So in all fairness, what she did describe was seeing things that were, that then disappeared when she closed her eyes, is that correct?
 {¶ 36} "A: Doctor Tennenbaum: In fairness . . .
 {¶ 37} "Q: Attorney Weaver: Or turned her head.
 {¶ 38} "A: Doctor Tennenbaum: In fairness to Tabitha, what I've described in my report is exactly what she told me which clearly from all information available to me, is unverifiable.
 {¶ 39} "Q: Attorney Weaver: And did she describe hearing things, which then she saw no physical phenomenon such as footsteps or bodies to associate with what she had heard, is that correct?
 {¶ 40} "A: Doctor Tennenbaum: That is correct." Transcript at 9-14.
 {¶ 41} The next witness to testify at the hearing was Jennifer Hess, an intake worker with Muskingum County Children Services who was assigned Clayton's case. Hess testified that the complaint was filed after Clayton was admitted to the hospital on February 9, 2006 with suspected pneumonia and RSV (respitory syncytial virus), which *Page 6 
is a respitory virus that can lead to pneumonia, and appellant failed to visit him from February 9, 2006 through his release on February 15, 2006. Appellant's mother stayed with Clayton during such time. When Hess spoke with appellant, appellant told Hess that she had to get caught up on laundry and did not give any reason why she did not visit her son. Hess further testified that appellant "talked about having Clayton go home with a relative to stay until you know, she could get on her feet. . . ." Transcript at 17. According to Hess, during a meeting with appellant at the hospital, appellant broke down and indicated that she could not deal with Clayton much of the time because he would cry a lot. The following testimony was adduced when Hess was asked whether it was appellant's idea to place Clayton with the Davis's:
 {¶ 42} "A: Jennifer Hess: Yes. We talked about some different relatives at the family meeting. There were several, a few different names given and the Davis's were one of the names and we were able to make contact with them pretty, pretty much right after the meeting and they were in agreement with taking Clayton.
 {¶ 43} Q: Attorney Tarbert: What I'm trying to get at is, was it Tabitha, Tabitha's idea to hand the baby over to the Davis's or was that more of your agencies prompting?
 {¶ 44} "A: Jennifer Hess: She wanted the child placed with a family member. We were, our agency was also concerned about the child going home with Tabitha so it was kind of on both ends. We basically told her you know, we do not feel comfortable with Clayton going home with you. In turn, she was in agreement to place the child with, with the Davis's." Transcript at 18-19.
 {¶ 45} Anita Friel, a social worker who works for Help Me Grow, testified that her agency first became involved with Clayton when they received a referral on November *Page 7 
1, 2005 because appellant was a first time teen mother. A second referral was received by the agency on January 17, 2006 when Clayton was released from the hospital. In January of 2006, Clayton had been taken to the hospital by Life Flight. Friel testified that her agency received the second referral because Clayton was at risk for developmental delays due to his RSV and respitory failure. When asked whether she was able to help Clayton at that time, Friel testified that she was unable to do so because she was unable to make contact with appellant or her family.
 {¶ 46} Friel further testified that her agency later became involved with Clayton when he was hospitalized again in February of 2006 for RSV. She testified that she went to the hospital and, after discovering that the family was not present, left brochures, a card and information about her agency's program for Clayton's family. Accordingly, to Friel, neither appellant nor her family contacted her. Friel also testified that she never had any personal contact with appellant, but that she had left messages for appellant and no one returned her calls.
 {¶ 47} The next witness to testify at the hearing was Marsha Wagner Seevers, a licensed social worker with Genesis Healthcare, who testified she came into contact with Clayton when he was admitted to the hospital in February of 2006. Seevers testified that she was notified by another social worker that appellant had failed to visit Clayton in the hospital and that she called appellant on February 9, 2006, and requested that she come and stay with Clayton at the physician's suggestion. Appellant, however, did not show up at the hospital until February 15, 2006, and never gave a good reason why she did not visit Clayton in the hospital. *Page 8 
 {¶ 48} Appellant testified at the hearing that she did not visit Clayton in the hospital between his admittance on February 9, 2006, and his release on February 15th or 16th of 2006 because she was doing laundry. Appellant testified that she was told by the hospital that if she did not have clean clothes on, Clayton could get sick again, because RSV lingers in clothing. When asked, appellant denied that she told Jennifer Hess that she could not care for Clayton ninety percent (90%) of the time.
 {¶ 49} The following testimony was adduced when appellant was asked whether she recalled her psychological evaluation by Dr. Tennenbaum:
 {¶ 50} "Q: Attorney Tarbert: Do you recall disclosing to him what I would term hallucinations, dead bodies in the closet, things flying around the room?
 {¶ 51} "A: Tabitha Anderson: To me that's real and that's just the way I believe that that is possible.
 {¶ 52} "Q: Attorney Tarbert: So you, your, your still maintaining that you actually saw those things?
 {¶ 53} "A: Tabitha Anderson: Yes.
 {¶ 54} Q: Attorney Tarbert: That's correct? Okay. Do you believe that a person can be possessed?
 {¶ 55} "A: Tabitha Anderson: Yes.
 {¶ 56} "Q: Attorney Tarbert: Have you ever thought anybody in your family was possessed?
 {¶ 57} "A: Tabitha Anderson: No.
 {¶ 58} "Q: Attorney Tarbert: Do you remember accusing Doctor Tennenbaum of hitting your hand? *Page 9 
 {¶ 59} "A: Tabitha Anderson: Yes.
 {¶ 60} "Q: Attorney Tarbert: Is that still your test, your belief and testimony today?
 {¶ 61} "A: Tabitha Anderson: Yes.
 {¶ 62} "Q: Attorney Tarbert: How did that happen? Could you describe that?
 {¶ 63} "A: Tabitha Anderson: He had me playing with these little blocks and I had to make the blocks look like the picture on the paper. Well the picture was tilted so I went to move it so I could see it better and he hit my hand and told me not to move it.
 {¶ 64} "Q: Attorney Tarbert: Do you recall telling Doctor Tennenbaum that you saw someone murdered on Maple Avenue?
 {¶ 65} "A: Tabitha Anderson: Yes.
 {¶ 66} "Q: Attorney Tarbert: Could you tell me what happened and what you saw?
 {¶ 67} "A: Tabitha Anderson: I was laying down ready for bed and I just glanced over where our closet was and there was a bunch of like wooden stuff in the way but I seen it. It was like a flashback from where there was nothing there and the apartment used to be a ballroom. That there was a lady in a red dress. Hair done, nails done, everything, laying there in front of the closet and I don't know what happened but I found out later that there had been somebody murdered in that apartment.
 {¶ 68} "Q: Attorney Tarbert: How long (sic). have you been seeing things like this and things moving out, things flying off the shelves, have you noticed things like that your whole life?
 {¶ 69} "A: Tabitha Anderson: A little bit at my mom and dads but not as much until after I got out on my own. *Page 10 
 {¶ 70} "Q: Attorney Tarbert: And when was that?
 {¶ 71} "A. Tabitha Anderson: I moved in with Tim in December.
 {¶ 72} "Q: Attorney Tarbert: December of 05?
 {¶ 73} "A: Tabitha Anderson: 05. Transcript at 40-42.
 {¶ 74} Appellant further testified that she had experienced hostile spirits since Clayton was born and that the spirits could hurt her and Clayton and could enter a body and hurt someone. She further testified that the Bible could become hot because a spirit wanted it to become hot and that it could burn anything. Appellant also testified that the spirits could throw things at her and Clayton and that she was afraid that Clayton could be hurt. She further testified that if a spirit possessed Clayton, Tim, her boyfriend, would help her out and that there would be pain associated with ridding Clayton of the possession.
 {¶ 75} At the hearing, the Guardian Ad Litem recommended that Clayton be temporarily placed with the Davis's because she was concerned that the "phenomena" that appellant experienced might pose a risk to Clayton.
 {¶ 76} Pursuant to an order filed on May 17, 2006, the trial court found Clayton to be a dependent child as defined in R.C. 2151.04(B) "because his condition or environment is such as to warrant the State, in the interests of the child, in assuming his guardianship." The trial court also found that continuation in appellant's home would not be in Clayton's best interest and welfare and that the agency had made reasonable efforts to prevent placement. The trial court granted temporary custody of Clayton to Ty and Deanna Davis with protective supervision. *Page 11 
 {¶ 77} Appellant, on May 22, 2006, filed a request for findings of fact and conclusions of law. On May 23, 2006, a Nunc Pro Tunc order was filed stating that Clayton was dependent "because he is a child who lacks adequate parental care or support by reason of the mental or physical condition of the child's parent/parents, guardian or custodian." Thereafter, the trial court filed findings of fact and conclusions of law on July 6, 2006.
 {¶ 78} Appellant now raises the following assignments of error on appeal:
 {¶ 79} "I. IT WAS PREJUDICIAL ERROR AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE FOR THE TRIAL COURT TO FIND THE MINOR CHILD TO BE DEPENDENT WHO LACKED PARENTAL CARE OR SUPPORT BY REASON OF THE MENTAL OR PHYSICAL CONDITION OF THE CHILD'S PARENT/PARENTS, GUARDIAN, OR CUSTODIAN.
 {¶ 80} "II. IT WAS PREJUDICIAL ERROR AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO FIND THAT APPELLANT WAS UNABLE TO ADEQUATELY CARE FOR HER CHILD AND THE CHILD WOULD BE AT SUBSTANTIAL RISK OF HARM OR INJURY DUE TO APPELLANT'S MENTAL CONDITION.
 {¶ 81} "III. IT WAS PREJUDICIAL ERROR AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO FIND THAT THE CONTINUATION OF THE CHILD'S PRESENCE IN APPELLANT'S HOME WOULD BE CONTRARY TO THE BEST INTEREST AND WELFARE OF THE MINOR CHILD. *Page 12 
 {¶ 82} "IV. IT WAS PREJUDICIAL ERROR AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO FIND THAT APPELLEE, CHILDREN SERVICES, MADE REASONABLE EFFORTS, TO PREVENT PLACEMENT OUTSIDE THE HOME.
 {¶ 83} "V. IT WAS PREJUDICIAL ERROR AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE TO FIND THAT TEMPORARY PLACEMENT OF THE MINOR CHILD WITH TY AND DEE DAVIS WAS IN THE BEST INTEREST OF THE MINOR CHILD."
 I, II, III, IV, V {¶ 84} Appellant, in her five assignments of error, challenges the trial court's finding that Clayton was a dependent child and that temporary placement of Clayton with Ty and Deanna Davis was in Clayton's best interest and welfare.
 {¶ 85} A finding of dependency must be supported by clear and convincing evidence. See R.C. 2151.35(A)(1) and Juv.R. 29(E)(4). The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate; being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." Cross v. Ledford (1954), 161 Ohio St. 469, 477,120 N.E.2d 118, citing Merrick v. Ditzler (1915), 91 Ohio St. 256, 267, 110 N.E. 493. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Cross, supra. 477. *Page 13 
 {¶ 86} R.C. 2151.04 defines a "Dependent child", in relevant part, as follows: As used in this chapter, "dependent child" means any child: . . .
 {¶ 87} "(B) Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;"
 {¶ 88} The determination of whether a child is dependent, as defined by R.C. 2151.04, must be made as of the time of the hearing on the complaint. In re Justice (1978), 59 Ohio App.2d 78, 80, 392 N.E.2d 897;In re Bishop (1987), 36 Ohio App.3d 123, 125-126, 521 N.E.2d 838. See also In re Barcelo (June 26, 1998), Geauga App. No. 97-G-2095,2000 WL 489731[1]
 {¶ 89} The trial court, in its July 6, 2006 findings of fact and conclusions of law, found that Clayton was a dependent child because appellant suffered from a mental condition rendering her unable to adequately care for him. The court further found that if maintained in appellant's care, Clayton would be at substantial risk of harm or injury due to appellant's mental condition. We agree. As is set forth in detail above, testimony was adduced at the hearing that appellant suffers from delusions in the form of hallucinations. Appellant testified at the hearing that she sees spirits and believes that people can be possessed by them. She further testified that she believes that the spirits could hurt Clayton by, for example, entering a body and slapping him or throwing things at him. When asked if she was afraid that Clayton could be hurt, appellant testified in the affirmative. She further testified that, if a spirit possessed Clayton, Tim, her boyfriend, would help her drive the spirit out of his body and that there would be some *Page 14 
pain associated with the procedure. Testimony also was adduced at the hearing that appellant's mental condition made her unable to ensure Clayton's health. As is stated above, agency attempts to contact appellant to help her deal with Clayton's RSV and his potential for developmental delays due to his RSV were unsuccessful. In addition, appellant did not visit Clayton while he was in the hospital because she had to do laundry. In short, there was testimony demonstrating that the condition of dependency, which was appellant's mental condition, was present as of the date of the hearing as well as of the date of the filing of the complaint. We note that R.C. 2151.04 does not require an adjudication of incompetency or a diagnosis of mental illness.
 {¶ 90} Furthermore, testimony adduced at the hearing established that appellant only suggested placement with the Davis' after Jennifer Hess informed her that her agency was not comfortable with the idea of Clayton going home with appellant. After the agency voiced its concerns, appellant agreed to placement with the Davis's.
 {¶ 91} In short, based on the foregoing, we find that the trial court's finding that Clayton was dependent "because he is a child who lacks adequate parental care or support by reason of the mental or physical condition of the child's parent/parents, guardian or custodian" is not against the manifest weight of the evidence. We further find, based upon the facts set forth above, that the court's findings that appellant was unable to adequately care for Clayton, that he would be at substantial risk of harm or injury due to appellant's mental condition and that continuation in appellant's home would be contrary to Clayton's best interest and welfare were not against the manifest weight of the evidence. *Page 15 
 {¶ 92} As is stated above, appellant also contends that the court's findings, that appellee made reasonable efforts to prevent placement outside of appellant's home and that temporary placement of Clayton with the Davis's was in Clayton's best interest, were against the manifest weight of the evidence. However, we note that there was testimony in the record that appellant did not cooperate with Muskingum County Children Services and Help Me Grow. Testimony also indicated that she was unable to care for Clayton the majority of the time due to his health, and that, after being advised that Muskingum County Children Services was not comfortable with Clayton going home with appellant, appellant suggested that Clayton be placed with Ty and Deanna Davis, appellant's relatives. We further concur with appellee that appellant's brief does not "put forth any reasoning or point anywhere in the record that supports" assignments of error three, four or five.
 {¶ 93} Based on the foregoing, appellant's five assignments of error are overruled. *Page 16 
 {¶ 94} Accordingly, the judgment of the Muskingum County Court of Common Pleas, Juvenile Division is affirmed.
By: Edwards
J. Farmer, P.J. and
 Wise, J. concur *Page 17 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Muskingum County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to appellant.
[1] We acknowledge that there is a split of authority among appellate districts over whether the state must establish dependency as of the time specified in the complaint or as the time of the hearing of the complaint. See In the Matter of S.H., Butler App. No. CA2005-01-007,2005-Ohio-5047. In Butler, the court held that the state was required to prove dependency at the time alleged in the complaint. This Court, and others, have held otherwise. See Bishop, supra. and Barcelo, supra. *Page 1